# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.                                               Case No. 24-cr-20141

ISAIAH OKOH                          Hon. Judge Judith E. Levy
                                                 Hon. Magistrate Kimberly G. Altman

---

## THE UNITED STATES OF AMERICA'S
## SENTENCING MEMORANDUM

---

The United States submits this Sentencing Memorandum in Aid of Sentencing pertaining to Isaiah Okoh. The United States respectfully requests that the Court (1) impose a sentence of 97 months' imprisonment, which is approximately the middle of Okoh's Guidelines' range; (2) order Okoh to pay restitution in the amount of $3,868, 331.52 to the Department of Health and Human Services and $21,428.93 to Blue Cross Blue Shield of Michigan, for a total of $3,889,760.45, jointly and severally with his co-conspirator; (3) order a special assessment of $100; and (4) order a three-year term of supervised release.

## **Background**

From 2019 through 2022, pharmacist Isaiah Okoh used his pharmacy license to commit fraud across three pharmacies in the Eastern District of Michigan — Gracee Pharmacy, PLLC, ("Gracee") Warren Family Pharmacy LLC, ("Warren Family") and Warren Pharmacy Rx LLC ("Warren Pharmacy") (collectively, "the Pharmacies").   Okoh and his co-conspirator, Ali Naserdean,[1] systematically defrauded Medicare, Medicaid, and Blue Cross Blue Shield of Michigan by billing for drugs that were not medically necessary, not prescribed by a doctor, and not actually dispensed to patients.

Throughout the conspiracy, Okoh used his professional license to bilk government programs and private insurance.  Okoh started his fraudulent enterprise at Gracee Pharmacy, then expanded it to Warren Family, and Warren Rx.  He served as the pharmacist-in-charge at each of the Pharmacies, which meant that he was the designated person under Michigan law responsible for the operations and compliance of the Pharmacies.  At each of the Pharmacies, Okoh and Naserdean submitted claims to insurance programs for high-priced medications that they never dispensed and for which they never purchased sufficient inventory.  This is called a shortage scheme. Okoh and Naserdean targeted these high-dollar drugs in order to

---

[1] Naserdean's case is currently pending before this Court.  *See United States v. Naserdean*, No. 25-20454.

receive the maximum reimbursements possible for distributing nothing.  And in doing so, they exploited the trust that Medicare, Medicaid, and BCBSM place in health care professionals to accurately bill claims that are free from fraud and misrepresentations.  Okoh knew that health insurance programs don't have the time or resources to individually audit each claim they receive — and he knew that if he billed claims, the health insurers would trust that he was giving the medications to real patients and would pay him for what he said he was owed.

But Okoh lied.  First, he lied about actually delivering the medicines to patients.  The individuals Okoh targeted in his conspiracy were real people, and in some cases, they were real customers of Okoh's pharmacies.  But these patients did not have any idea that Okoh was fraudulently using their Medicare or Medicaid number to bill the government for medications they had never been prescribed and never taken.  For instance, Medicaid beneficiary P.A. is a mentally-disabled man who lives in the metro-Detroit area.  He went to Okoh's pharmacies for a short time, but never received the expensive medications (like Rexulti, Latuda, and Restasis) that Okoh billed on a monthly basis in his name.  Or take Medicaid beneficiary S.T., who lived in one of the rental houses that Okoh owns.  S.T. agreed to use her landlord's pharmacy, but only later learned that Okoh was billing her Medicaid insurance monthly for expensive antipsychotic medications that she had never been

prescribed or received. The list of beneficiaries used in Okoh's fraud scheme goes on and on.

Second, Okoh lied about actually receiving real prescriptions from medical practitioners. Medicare and Medicaid beneficiaries weren't the only pawns used in Okoh's fraud. Over and again, Okoh and Naserdean used the prescriber information for doctors Saleh Ghaith and Vincent Rampersaud and physician assistant Thierry Desir to submit bills for medications for patients like S.T. and P.A., representing to insurers that these doctors had prescribed the medicines being billed in the names of the insurance beneficiaries. But in reality, the doctors and physician assistant *had no idea* that their prescriber information was being used by Okoh and Naserdean. When interviewed, these medical providers *denied ever treating the patients* billed by Okoh and Naserdean, and *denied ever having prescribed* the medications purportedly dispensed by the Pharmacies to the individual patients. Similarly, the patients had never heard of or seen these medical practitioners either. The claims were fraud, through and through.

A search of Naserdean's house revealed the source for the prescriber information — prescription pads for each of doctors Ghaith and Rampersaud, and physician assistant Desir, filled out for patients that these medical providers had never treated and written for medications they had never prescribed. *See* ECF No. 70 (Motion to Admit Inextricably Intertwined Evidence); ECF No. 74 (Order

Granting Motion to Admit Inextricably Intertwined Evidence).  Okoh and Naserdean used these medical providers' information to issue unauthorized controlled substances illegally from the Pharmacies at the same time that they shorted high-reimbursement prescription medication at those same Pharmacies using the same medical provider information.  Moreover, a search warrant executed at Naserdean's house (which was actually owned by Okoh and at which Okoh allowed Naserdean to reside as part of the benefit conferred for remaining in the conspiracy) revealed dozens of containers of controlled substances, including Schedule II substances like oxycodone and hydrocodone, alongside filled-out prescriptions in both Dr. Rampersaud and Dr. Ghaith's names for controlled substances, which both doctors deny ever writing.[2]

Through three pharmacies and across three years, Okoh and Naserdean defrauded Medicare, Medicaid, and BCBSM of approximately $6,110,772.60. They profited greatly from their fraudulent scheme, paying each other through shell companies, including the one (Zeep Investments, LLC) that Okoh used to purchase his home with fraudulent proceeds.  They sent each other frequent reports about the

---

[2] Other evidence in the government's investigation indicates that Okoh demanded payment from drug runners to bring high-reimbursement prescriptions to the pharmacies in addition to prescriptions for controlled substance.  Okoh would then dispense the controlled substances in exchange for cash, at the same time fraudulently billing the high-reimbursement prescriptions to government programs without dispensing them to the patients/drug runners.

money that was flowing into their conspiracy, patting each other on the back for their

fraud.

A      **Ali(RPh) (13136712411)**
Total Scripts 228
5178.62

IO     **Isaiah Okoh (2348067390809)**
Damn u killing it bro

IO     **Isaiah Okoh (2348067390809)**
I am here at my uncles house,still no response

A      **Ali(RPh) (13136712411)**
My homie Z we are a team

A      **Ali(RPh) (13136712411)**
Dam for real

IO     **Isaiah Okoh (2348067390809)**
We da A Team bro

A      **Ali(RPh) (13136712411)**
You already know we are going to blow up The whole world is going to know our name

IO     **Isaiah Okoh (2348067390809)**
We turn happy customers to happy customers

They joked with each other via text message about how much money they were

making, with Okoh even going so far as to speculate that if they kept on bilking the

government, they'd have to find places to bury their fraud money.

A    **Ali(RPh) (13136712411)**
     MY HOMMIE Z

A    **Ali(RPh) (13136712411)**
     I'm still thinking about today's deposit that shit was Dope AF imagine that was every week 😂

IO   **Isaiah Okoh (2348067390809)**
     If that was every week we will dig a pit in Dearborn and bury some..lol

A    **Ali(RPh) (13136712411)**
     Lol Hommie we will need To dig a grave in every city to bury it

IO   **Isaiah Okoh (2348067390809)**
     Lol

A    **Ali(RPh) (13136712411)**
     Total Scripts 219
     8,676.28

They exchanged gossip of others being arrested for fraud and diversion by the government, confident that they were ahead of law enforcement and that they would never be caught.



A    **Ali(RPh) (13136712411)**                                    6/2/2020, 7:11 PM
     Lmaoooo this is referring to ▮▮▮▮▮▮

A    **Ali(RPh) (13136712411)**                                    6/2/2020, 7:11 PM
     The drug dealers I grew up with had cars🚗 houses🏠 and money💰 Ya new drug dealers dont have nothing 💀 Not even drugs sometimes 💀😂

IO   **Isaiah Okoh (2348067390809)**                               6/2/2020, 7:34 PM
     Lol

They were wrong.

## **Procedural History**

By early 2024, Okoh had caught wind that government agents were interviewing his tenants about the drugs he was billing in their names, and only weeks earlier a Michigan court had ordered that he would be held civilly liable for

over $1 million in Medicaid losses at Gracee alone, with the potential for treble damages to be determined at a later date.  Okoh realized that law enforcement was closing in, and on February 25, 2025, Okoh was arrested on a criminal complaint at Detroit Metro Airport as he attempted to flee the United States for Nigeria.  The magistrate judge ordered him detained, which this Court affirmed after noting its "serious concern" that "something else was going on that was … deceptive, an act of deception for law enforcement."  ECF No. 35, PageID.272.   The grand jury indicted Okoh on March 19, 2024, ECF No. 14, then issued a superseding indictment on January 23, 2025.   On April 25, 2025, Okoh pleaded guilty pursuant to a Rule 11 plea agreement to one count of conspiracy to commit health care fraud.

## Guidelines

The parties agree regarding the following base offense level and enhancements for Count 1, (ECF No. 76, PageID.520):

| | | |
|---|---|---|
| Base Offense Level: | 6 | [U.S.S.G. § 2B1.1(a)(2)] |
| Intended Loss > $3,500,000: | +18 | [U.S.S.G. § 2B1.1(b)(1)(J)] |
| Federal Health Care Offense > $1,000,000 | +2 | [U.S.S.G. § 2B1.1(b)(7)] |
| Sophisticated Means | +2 | [U.S.S.G. § 2B1.1(b)(10)] |
| Abuse of Trust: | +2 | [U.S.S.G. § 3B1.2] |
| Acceptance of Responsibility | -3 | [U.S.S.G. § 3E1.1] |

These agreed-upon guidelines result in an offense level of 27.  The government seeks the further application of a two-point enhancement under U.S.S.G. § 3B1.1(c) for his role as an organizer, leader, manager, and supervisor in the conspiracy.[3]

The Sixth Circuit has held that a leader or organizer role is appropriate when criminal activity is "extensive," even if it lacked five or more people.  *See United States v. Myers*, 854 F.3d 341, 358 (6th Cir. 2017) (finding that even though the defendant used only two to four knowing participants to carry out his scheme, the complexity of the conduct made it reasonable to consider it the functional equivalent of a crime with a few more knowing actors to warrant the enhancement.).

> In determining whether to apply the aggravating role enhancement and to what degree, courts should consider [1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree or participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

*United States v. Washington*, 515 F. App'x 384, 386 (6th Cir. 2013) (citing U.S.S.G. § 3B1.1 cmt. n. 4.).  "The Sixth Circuit requires a showing that the defendant managed or supervised one or more participants in order to justify an enhancement

---

[3] The PSR calculates a three-point enhancement for manager/supervisor under U.S.S.G. § 3B1.1(b).  *See* PSR at ¶ 36, A-1.  However, the Government objects to the PSR's calculation, as it is bound by the terms of the Plea Agreement to seek no more than a 2-point enhancement for leader/organizer under U.S.S.G. § 3B1.1(c).

under this provision[.]"  *United States v. Castilla-Lugo*, 699 F.3d 454, 460 (6th Cir. 2012).

Okoh easily qualifies for the enhancement.  To begin with, he managed at least four other criminal participants – Ali Naserdean, two drug runners (L.C. and D.P.), and a pharmacy technician (P.E.).  Okoh was the pharmacist-in-charge at all three Pharmacies, which meant that the Pharmacies could not have existed without him.  He was the only one with a professional license to dispense drugs, and the only one who could legally open the Pharmacies to the public.  Because of his position, Okoh had a right to claim a larger share of the proceeds — between himself and Naserdean, Okoh received approximately $2.9 million from the Pharmacies versus Naserdean's approximately $2.1 million.  Okoh managed the fraud scheme across each of the three Pharmacies, using the ability to remotely log into the pharmacy billing software to commit fraud, regardless of whether he was actually present in the pharmacy.  Okoh further used the unknowing services of others, including pharmaceutical wholesalers, Medicaid/Medicare beneficiaries, and doctors to commit his fraud.  He and Naserdean forged physician signatures on prescriptions to cover up the scheme, making it appear as though legitimate prescriptions had been sent to the pharmacy, when in fact they had not.  Okoh's management of this extensive conspiracy merits a two-point increase for aggravating role.

This brings Okoh's final offense level to 29, which results in a guidelines range of 87-108 months. The government recommends a sentence of 97 months, which is roughly the midpoint of this range.

### Sentencing Factors

Title 18, United States Code, Section 3553(a), provides numerous factors that the Court is to consider in sentencing the Defendant. Factors pertinent to the instant offense are discussed below, numbered as they are in Section 3553(a).

**(1)  The nature and circumstances of the offense and the history and characteristics of the defendant.**

**(A)  Nature and circumstances of the offense**

This is a serious and sustained fraud. Okoh used his pharmacy license, not to help the community, but to line his own pockets at the expense of social programs set up to care for the poorest and neediest among us — the elderly, indigent, and disabled. That callousness is indeed serious, and there is no legitimate explanation for Okoh's actions. The Medicare and Medicaid beneficiaries that Okoh used in his scheme are the sorts of people who exist at the fringes of society, fighting hard to keep their heads above water and in many instances, living paycheck to paycheck. But Okoh was willing to use them as pawns in his fraud scheme, submitting claim after claim, month after month, to Medicare and Medicaid for drugs he wasn't dispensing to people who had no idea their information had been compromised. Not even doctors were free from Okoh's scheme — he forged prescription after

prescription and submitted claim after claim using physician names and prescriber information to help make his conspiracy appear legitimate.

To label this conspiracy corrosive to public trust is to understate the case. Okoh deliberately targeted government programs because he knew that they would pay based on trust — a trust he was all too willing to exploit to line his own pockets. He billed for medications he never even had in stock, and ended up defrauding Medicare, Medicaid, and Blue Cross Blue Shield of Michigan over $6.1 million. That's $6.1 million that could and should have gone to paying for healthcare for people who need it.

Okoh's crime is very serious and merits a sentence in the middle of the guidelines range.

### (B)  The history and characteristics of the defendant

Isaiah Okoh could have been an American success story were it not for his greed.  He immigrated to the United States as an adult, and became a United States citizen in 2009.  As a pharmacist, Okoh had every opportunity to live a privileged life.  The Michigan Pharmacists Association ("MPA") estimates that pharmacists make an average of $118,000 per year.[4]   When Okoh worked as a legitimate

---

[4] Michigan Pharmacist's Association, "How Much Does a Pharmacist Make?" available online at https://careerconnect.michiganpharmacists.org/salary/pharmacist (accessed September 30, 2025).

pharmacist at Rite Aid and Kroger from 2006-2016, he reported making as much as $156,000 per year, *see* PSR at ¶¶ 74, 77, which places him over the 90th percentile in income for pharmacists, according to the MPA.  And according to the Census Bureau, the median household income for Macomb County is approximately $78,000, which placed Okoh's salary at double that of his surrounding community. United States Census Bureau, "Macomb County, Michigan," available online at https://data.census.gov/profile/Macomb_County,_Michigan?g=050XX00US26099 (accessed September 30, 2025).  By any measurement, Okoh had the opportunity to live a comfortable upper middle-class lifestyle, a far cry from his humble beginnings in his native Nigeria.

But Okoh wanted more, and he was willing to defraud the United States to get it.  In 2019, he started his scheme at Gracee, before expanding to two additional locations by the time the scheme ended in 2022.  Over these three years, he defrauded the United States and BCBSM of over $6.1 million, which he spent in a variety of ways, including purchasing a home with cash in the name of one of his shell

companies. Okoh wasted whatever legitimate opportunities he once had, and he has only himself to blame for his own repeated criminal decisions.

**(2) The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with appropriate education, vocational training, or medical care.**

Health care fraud is a serious problem nationwide, and particularly so in the Eastern District of Michigan. The National Health Care Anti-fraud Association, an organization composed of both public and private health insurers and regulators, conservatively estimates that three percent of all health care spending in the United States is lost due to fraud. Medicare and Medicaid are trust-based systems — and when pharmacists like Okoh abuse that trust by billing fraudulent claims for medications that they never dispensed (or had in stock) and then stand in the shoes of medical providers to authorize orders which are not medically necessary, it subverts patient choice and degrades that trust. Specifically, it degrades the citizenry's faith in its government to prevent fraud, waste, and abuse, and increases cynicism toward programs set up to help the most vulnerable among us, the indigent, the disabled, and the elderly.

Okoh's punishment should take into account not only the scope and seriousness of his own criminal conduct, but also the need to deter others from engaging in these types of schemes. The Sixth Circuit Court of Appeals has

14

emphasized that "economic and fraud-based crimes . . . are prime candidates for general deterrence" because these crimes "are more rational, cool, and calculated than sudden crimes of passion or opportunity." *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (*quoting United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)). Indeed, Okoh committed not just one or two acts of fraud to perpetrate his scheme, but hundreds over the space of years, fraudulently submitting claim after claim that he knew to be false, all to increase his own profit at the expense of the public.

The vast majority of the money involved in the charged scheme came from the Medicare and Medicaid programs. Those programs, funded by American taxpayers, are a public trust intended to provide health insurance for the indigent, the elderly, and the disabled. Every dollar that Okoh helped divert from this program — to himself and Naserdean — is a dollar that could and should have been used to pay for treatment, medications, and supplies that Medicare and Medicaid beneficiaries actually needed. Accordingly, Okoh's punishment should reflect the need to promote respect for the laws that protect the public and guard against fraud, especially as it relates to healthcare fraud.

**(3)  The kinds of sentences available**

Under 18 U.S.C. § 1349, the maximum sentence is ten years' imprisonment and the maximum fine is $250,000 or twice the gain/loss.

**(4)    Any pertinent policy statement issued by the United States
Sentencing  Commission ("U.S.S.C.")**

The United States is unaware of any pertinent policy statements issued by the U.S.S.C. However, the Patient Protection and Affordable Care Act ("PPACA"), enacted in March 2010, provides the most recent evidence of congressional intent in this area of the law. PPACA specifically provides for increased sentences for health care fraud offenses, and further requires the U.S.S.C. to "ensure that the Federal Sentencing Guidelines and policy statements - (i) reflect the serious harms associated with health care fraud and the need for aggressive and appropriate law enforcement action to prevent such fraud; and (ii) provide increased penalties for persons convicted of health care fraud offenses in appropriate circumstances." Pub. L. No. 111-148, § 10606(a)(3).

**(5)    The need to avoid unwarranted sentencing disparities among
defendants with similar records**

This sentencing factor is intended to address national sentencing disparities, and it is widely recognized that a Guidelines sentence is the best way to avoid such disparities. *See United States v. Smith*, 564 F. App'x 200, 205 (6th Cir. 2014) (stating that "one of the fundamental purposes of the Guidelines is to help maintain national

16

uniformity in sentences, and considering that most sentences are within the Guidelines, the Guidelines themselves represent the best indication of national sentencing practices"); *Rita v. United States*, 551 U.S. 338 (2007). Okoh's Guidelines range takes into account the specific characteristics of his offense and imposing a Guidelines sentence is the best way to avoid unwarranted sentencing disparities with similarly-situated defendants nationwide.

## Conclusion

For the foregoing reasons, the United States respectfully requests that the Court (1) impose a sentence of 97 months' imprisonment; (2) order Okoh to pay restitution in the amount of $3,868, 331.52 to the Department of Health and Human Services and $21,428.93 to Blue Cross Blue Shield of Michigan, for a total of $3,889,760.45, jointly and severally with his co-conspirator; (3) order a special assessment of $100; and (4) order a three-year term of supervised release.

Respectfully submitted,

JEROME F. GORGON JR.
United States Attorney

LORINDA LARYEA
Acting Chief
U.S. Department of Justice
Criminal Division, Fraud Section


*s/ Jeffrey A. Crapko*
Jeffrey A. Crapko
Syed Ahmadul Huda
U.S. Department of Justice
Criminal Division, Fraud Section
211 W. Fort Street, Suite 2001
Detroit, MI  48226-3211
Phone:  (202) 445-9832
Email:  Jeffrey.Crapko@usdoj.gov

Date:  October 7, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 7 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to counsel for Defendant.

Date: October 7, 2025

<div style="margin-left:40%">

*s/ Jeffrey A. Crapko*
Jeffrey A. Crapko
U.S. Dept. of Justice
211 W. Fort Street, Suite 2001
Detroit, MI  48226-3211
(202) 445-9832
Jeffrey.Crapko@usdoj.gov

</div>